# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

v.

DANIEL A. TORRES-VIRUET,

Defendant.

Criminal No. 17-307-1 (ADC)

## OPINION AND ORDER

Defendant Daniel A. Torres-Viruet ("Torres") has been charged with one count of being a convicted felon in possession of a firearm, 18 U.S.C. § 922(g)(1) and 924(d)(1). **ECF No. 8**. On August 18, 2017, Torres moved the Court to suppress all physical evidence that agents of the Puerto Rico Police Department ("PRPD") seized, asserting that such evidence is the product of a warrantless entry and search of a private home, and an illegal arrest. **ECF No. 23**. The Government opposed the motion to suppress. **ECF No. 26**. On April 4, 2018, the Court held an evidentiary hearing on Torres's motion. The Court now **DENIES** Torres's motion to suppress, **ECF No. 23**.

## I.     Findings of Fact[1]

Sargent Rafael Andujar-Torres ("Sgt. Andujar"), Badge # 8-16959, has been a PRPD officer in the Fajardo Criminal Investigations Corps ("CIC") since 2015, where he currently oversees

---

[1] During the hearing, the Court heard the testimony of PRPD Agent Wylder Llanos-Torres, PRPD Sargent Rafael Andujar-Torres, and Jocelyn Caraballo-Solivan. **ECF No. 38**.

the Arrests and Searches Division. He has supervised over 500 arrests during his career. Sgt. Andujar was tasked with locating and arresting Chris García ("García"), who had an outstanding arrest warrant issued by the Commonwealth Court of Fajardo, Puerto Rico, for violation of controlled substances law.[2] Sgt. Andujar did not know García, nor his whereabouts, and the arrest warrant does not specify García's address or residence.

On May 9, 2017, homicide agents from the Fajardo CIC Division contacted Sgt. Andujar to inform him that they were debriefing an arrestee who claimed to have information regarding García's whereabouts. Sgt. Andujar then checked the NCIC system and verified that the arrest warrant for García was valid and outstanding. Early in the afternoon of May 9, Sgt. Andujar went to the Río Grande Police Station and debriefed the individual, who informed him—in a confidential manner—that García was living in Finca Galateo Public Housing Project ("Finca Galateo"). The confidential source said that García was staying in three different residences in Finca Galateo and would not stay in the same place every night because his life would be in danger if people found out where he slept. One of the residences was on Street #8, another on Street #5, and another on Street #2 within Finca Gataleo. The confidential informant also told him that García had a weapon. Sgt. Andujar did not take notes of the debriefing to instill confidence in and protect the identity of the informant.

---

[2] The arrest warrant was issued by the Commonwealth Court of First Instance, in Fajardo. The warrant commanded the PRPD Officers to arrest an individual by the name of Chris García, against whom felony charges were pending.

On that same day, Sgt. Andujar went, with a fellow officer, to Finca Galateo to corroborate the information, locate the three residences, and set up surveillance. He first went to the residence on Street #8, but did not see anything. He then followed Street #8 and turned left onto Street #5. On Street #5, close to the front of the administration building of Finca Galateo, he observed García peer his head out of the doorway of residence J-2 to observe Sgt. Andujar's car.[3] Reportedly, when García saw Sgt. Andujar's car, ducked inside the residence, and closed the door.

Sgt. Andujar observed García from a distance of approximately 25 feet, during the daytime, for approximately 5 or 6 seconds. Sgt. Andujar was familiar with García's description because he had been searching for him for a while, and he recognized García from two pictures provided by the police officer that had filed the state drug trafficking charges that led to the issuance of the arrest warrant against him. **Exhibits 2 and 3**. Sgt. Andujar had also visited the residence of García's mother, who had corroborated that the two photos were of García. During his testimony, Sgt. Andujar observed that in one of the pictures, **Exhibit 2**, García had a darker skin tone. On May 9, 2017, García had a darker skin tone, similar to the one shown in **Exhibit 2**.

Sgt. Andujar decided he could not arrest García at that moment because there were people walking around the neighborhood and the drug point was active. The drug point is across the street from the administration building, about 50-60 feet from the J-2 residence. Sgt.

---

[3] Sgt. Andujar identified **Exhibit 4** as the J-2 residence, located on Street #5 where he observed García on May 9, 2017. He also identified this house as the same house where Torres, the defendant in this case, was later arrested.

Andujar had visited Finca Galateo on many occasions because it is a well-known high-crime area. During one of his visits, individuals had opened fire on Sgt. Andujar and other officers, and they had exchanged fire. On that occasion, the officers arrested one individual and seized two assault rifles and ammunitions.

After deciding not to arrest García, Sgt. Andujar located the third residence mentioned by the confidential informant, located on Street #2. He then left the housing project.

After consulting the matter with fellow officers, Sgt. Andujar created a work plan to arrest García at Finca Galateo. Sgt. Andujar did not obtain a search warrant because the plan was not to search the three houses. Instead, the PRPD officers were to knock on the doors of the residences, identify themselves, explain the purpose of their visit, and ask for permission to enter the house and check if García was present. The working plan included García's name, the information contained in the arrest warrant, and the addresses of the three residences. Sgt. Andujar explained that this is the PRPD's policy, so that the PRPD officers are organized and everyone knows their role. The plan also included the address and information of nearby hospitals, in case there was an emergency.

On May 10, 2017, the officers that were to execute Sgt. Andujar's work plan began their shift at 4:00 a.m. Sgt. Andujar divided the officers into three groups, and each group was to visit one of the houses. Sgt. Andujar's group was to visit the house on Street #8.

The second witness, Wilder Llanos-Torres, ("Agent Llanos") Badge # 23777, has worked for the PRPD for 21 years. He is assigned to the Fajardo CIC, where he has worked for 5 years.

His responsibilities include arresting individuals for whom an arrest warrant has been issued, and he has participated in over 100 arrests. On May 10, 2017, Agent Llanos began his shift at 4:00 a.m. and Sgt. Andujar—his immediate supervisor—assigned him to provide support to a group of officers that were to execute the working plan to arrest García. Agent Llanos was tasked with providing support and security to his fellow officers and any civilians in and around the houses that they were to visit. Sgt. Andujar advised the officers that he believed that García was carrying a firearm.

Agent Llanos testified that, pursuant to the instructions and working plan prepared by Sgt. Andujar, the PRPD Agents were to visit three houses in Finca Galateo. Their instructions were to survey the residences assigned to them, talk to the people who lived there and ask them if they could search the house for García, and arrest García if he was found. They were instructed to arrest any person that attempted to flee. Agent Llanos was to visit the house on Street #5, along with Officers Ángel Puig, Ángel Acevedo, and Jorge Cruz. Agent Llanos wore khaki pants, a blue polo, a bullet-proof vest, and his police identification badge. He familiarized himself with the likeness of Mr. García through two photos provided by Sgt. Andujar. **Exhibits 2 and 3**.

On May 10, 2017, at around 6:00 a.m., Sgt. Andujar arrived at the residence on Street #8, knocked on the door and spoke with the people present. He corroborated that García was not there. Sgt. Andujar then went to the J-2 residence on Street #5, where Agent Llanos and another officer were stationed. Sgt. Andujar's group left their vehicles in front of the residence on Street

#5 and walked over to the residence on Street #2, knocked at the door, and explained that they were looking for García. The residents granted him access to the residence, but García was not there. He then received a call from Agent Llanos, who told him that he did not find García at the J-2 residence, but that they had arrested someone with a weapon. Sgt. Andujar then left the residence #2, went to street #5 to supervise, and spoke with Agent Llanos, who told him that he had observed through the window a man that matched García's description, and arrested him.

The PRPD Agents arrived at Finca Galateo at around 6:00 a.m., when the sun had begun to rise but it was not yet daylight. Agent Llanos described the house on street #5 as a one-level concrete residence, with a carport on its right side with a car inside, a front door to the left of the carport, and white, aluminum windows along the left front of the house. Upon arriving at the front of the house, the officers walked to the front door, crossing the street and the front lawn, which was unfenced and accessible from the sidewalk. Within a minute of arriving at Street #5, the rest of the agents positioned themselves in front of the door, which was closed.

Agent Llanos positioned himself close to the windows to the left of the front door, approximately 12 inches away from them, close enough to look inside the residence because the windows were open. **Exhibit 4 (marked by Agent Llanos)**. From the window, and before any agents knocked on the door or announced their presence, Agent Llanos observed inside the residence a man walking along the hallway towards the door and living room, about ten feet away from him. The man was wearing a red hooded sweater with the hood over his head. Agent Llanos could not see the man's face, nor determine his skin tone. At the time, he could not

determine if the man was García, but Agent Llanos observed that he had a similar, slender build

to García's. He further observed that the man—based on his experience as a police officer—was

carrying a dark weapon in his right hand. Llanos testified that he was able to see the individual

because the kitchen light was on, behind and to the left of the individual. **Exhibit 5**. Agent Llanos

believed that at the time it was not possible to knock on the door and ask the man for

identification or if he had a valid weapons license. At the time, Agent Llanos did not know if

the man possessed a weapons permit, and he did not know if the man was García.

Upon seeing the weapon, Agent Llanos alerted his fellow officers and exclaimed, "He's

got a gun." One of the fellow officers immediately yelled "Police" and Agent Puig kicked open

the front door to access the interior of the house. Agent Llanos drew his weapon and entered

the house first, followed by his fellow officers, "to arrest the individual [he] saw with the

firearm." The man inside the house turned around and ran away from the officers, down the

hallway toward the back of the house, and went into a room at the end of the hallway, on the

right. Agent Llanos followed the man down the hallway, never losing sight of him, and saw him

toss the firearm into a clothes hamper located inside the room, immediately to the left of the

doorway. The man then stepped to the middle of the room, and raised his hands. Agent Llanos

commanded the man to lay down on the ground and place his hands behind his back. The man

complied, and Agent Llanos arrested and handcuffed him. He searched the man, removed the

hoodie, and corroborated that he was not García. Agent Llanos arrested the man because he was

in possession of a firearm, but at that moment, he did not ask if he had a permit for the firearm. He read him his rights in the room.

The man was wearing jeans, tennis shoes, and a t-shirt under his jacket. Agent Llanos asked the individual he had just arrested for his name and residence, but the man declined to provide the information. During the hearing, Agent Llanos identified the man he had arrested as defendant Daniel Torres-Viruet ("Torres"). After his arrest, Torres was advised of his rights. When Agent Llanos performed a security pat-down on Torres, he found a large amount of cash on his person. **Exhibit 9**.

At the time, Torres did not provide his name or explain why he was inside the house. He only said he was sleeping, but never specified where he was sleeping. Agent Llanos did not observe pillows, sheets, or clothing on the living room sofa, which did not look like it was being used. **Exhibit 10-13**.

Agent Llanos then immediately went to the hamper and found the weapon, which was visible in plain sight and laying on top of the clothes. He took a picture of the weapon with his cellphone before seizing it. **Exhibit 6**. The weapon was a revolver, painted dark purple, and it was loaded with six rounds. Upon closer inspection, Agent Llanos identified the gun as a .38 caliber.

While arresting Torres, Agent Llanos noticed there was a woman in the bedroom, sitting on the bed. She appeared anxious and scared, and wore sleeping clothes, a spaghetti-strap blouse and shorts. There was also a minor in the room, who was around 4 or 5 years old. Agent

Llanos observed that the bed was half made, and the covers were thrown to one side, as if the woman had been covered with them and threw them to one side. It did not appear to Agent Llanos that another person was sleeping in the bed. There was another minor in the house, approximately 12 years old, who was sleeping in the room adjacent to the carport and closer to the entrance door, on the right side of the hallway. **Exhibit 7**.

After the arrest and seizure, Agent Llanos spoke with the woman, who identified herself as Jocelyn Caraballo-Solivan ("Caraballo") and said she was the principal tenant of the house and the mother of the two minors. Agent Llanos asked her if she knew the man he had just arrested. Caraballo answered that she had no relationship with the arrested individual, but that she recognized him from the housing project and knew him by the alias "Kripi/Crippy." She said she did not know how or why the man was there. When Agent Llanos asked her about García, she said she did not know anything about Chris García.

Agent Llanos also observed in the room tennis shoes and clothes that looked like they belonged to a man. When he asked Caraballo about these items, she replied that they belonged to a friend who visited her once in a while. **Exhibit 8**. Agent Llanos did not ask her about the firearm, and she did not say anything about the revolver. Agent Llanos then took more pictures of the residence.

Agent Llanos then took Torres outside to one of the PRPD vehicles and called Sgt. Andujar to inform him of the arrest. After receiving the call from Agent Llanos, Sgt. Andujar headed over to the J-2 residence and saw Torres outside, with Agent Llanos. Sgt. Andujar

testified that, at a glance, Torres looked like García, as they were both slender, had the same height, and similar skin color. He had not seen Torres before that day.

Sgt. Andujar spoke with Caraballo outside the residence, and she seemed a bit nervous, given the circumstances. He asked her if she knew the man who was arrested in her residence, and she replied that she had seen him in the housing project and that he would visit her on occasion.[4] When Sgt. Andujar asked her if she knew García, she said that she knew García because he was born and raised in that housing project.

Eventually, Agent Llanos left with Torres for the Fajardo police station. García was not located on May 10, 2017, but was arrested approximately a month later.[5]

A.        Testimony of Jocelyn Caraballo

Jocelyn Caraballo lives in house J-2, Street #5 of Finca Galateo Housing Project in Rio Grande, Puerto Rico. She testified that she rents the house from the Puerto Rico Government, although she does not pay rent, just utilities. She further testified that she lives there with her two sons and defendant Torres.

Caraballo has known Torres for three years, and is friends with him. She has authorized Torres to stay at her residence, and on May 10, 2017, he had permission to stay there. In response to questioning, she admitted that although the rental agreement states who can reside in the

---

[4] However, during the evidentiary hearing, Caraballo testified that she has known Torres for three years, and is friends with him, and that by May 10, 2017 he had lived with her at the J-2 residence for approximately three months.
[5] Sgt. Andujar testified that approximately 1-1½ months later, the PRPD Drug and Narcotics Division arrested García.

house and prohibits guests from staying for extended periods, she did not inform the government that Torres was living with her on May 10, 2017.[6] She testified that Torres slept on the sofa in the living room, and that each night she would leave a blanket and pillow for him, which she put away each morning. Torres also kept some personal items and clothes in her bedroom.

### III.    Discussion

#### A.    Torres had a legitimate expectation of privacy in the J-2 residence.

The government first challenges Torres's standing to assert a Fourth Amendment violation and argues that Torres has failed to show that he was an authorized guest at the residence, that he had a reasonable expectation of privacy in the bedroom where the firearm was seized, or that the seized firearm was his property. **ECF No. 26** at 5.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. To successfully claim that a search or seizure "violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched." *United States v. Battle*, 637 F.3d 44, 48–49 (1st Cir. 2011) (citing *Minnesota v. Olson*, 495 U.S. 91, 95 (1990)). The Court applies a two-part test: "whether the defendant had an actual, subjective, expectation of privacy; and second,

---

[6] There was no testimony or evidence as to what is allowed or prohibited by the Housing Department and the rental agreement or what constitutes "extended periods of time."

whether that expectation 'is one that society is prepared to recognize as objectively reasonable.'" *United States v. Rheault,* 561 F.3d 55, 59 (1st Cir. 2009) (citing *Smith v. Maryland,* 442 U.S. 735, 740–41 (1979)). "A defendant may have a legally sufficient interest in a place other than his own home, such as in the home of a host who welcomes the defendant as an overnight guest." *Battle,* 637 F.3d at 49 (citing *Olson,* 495 U.S. at 98–100).

In support of the suppression motion, Torres submitted a Declaration Under Penalty of Perjury in which he states that "Jocelyn Caraballo allows him to occasionally spend the night at her residence and allowed him to stay there the night of May 9, 2017 until the morning of May 10, 2017." **ECF No. 23-1**. At the evidentiary hearing, Caraballo testified that she had authorized Torres to stay at her residence over several weeks, and that on May 10, 2017 he had permission to stay there. Thus, in the light most favorable to defendant and for purposes of his claim, the Court finds that Torres had a legitimate expectation of privacy at the J-2 residence during the morning of May 10, 2017.

During the hearing, the government argued that Torres could not have had a legitimate expectation of privacy at the J-2 house because, per the terms of the rental agreement, Caraballo cannot authorize him to reside there. The Court ordered the government to submit cases from the District of Puerto Rico where the government successfully argued that the defendant was not authorized to live in subsidized housing pursuant to the rental agreement with the Puerto Rico Government. The government complied and submitted two cases for the Court's

consideration: *United States v. Joshua Valle-Colón, et al.*, **Crim. No. 16-194 (FAB), ECF No. 131**, and *United States v. Jose Raúl Rodríguez-González*, **Crim No. 13-369 (DRD)**.

In *Valle-Colón*, the Court adopted the legal conclusion in a Report and Recommendation from a Magistrate Judge that:

> As an individual occupying public housing without the approval from the proper housing authority, Valle does not have standing to challenge the search of any items within the residence because he did not have an objectively reasonable expectation of privacy.

**Crim. No. 16-194 (FAB), ECF No. 131** at 6 (quoting **ECF No. 124** at 8).

The Magistrate Judge reached this conclusion after recognizing that, "Although courts have reached differing conclusions regarding a defendant's expectation of privacy in public housing, the more persuasive view is that there is no reasonable expectation of privacy where an individual occupies public housing without approval from the pertinent housing authority."

*Id.* **at ECF No. 124** at 7 (citing *United States v. Rodríguez-González*, **Crim. No. 13-369 (DRD), ECF No. 72** (D.P.R. filed October 7, 2014) and *United States. v. McClendon*, 86 Fed.Appx. 92, 95 (6th Cir. 2004) (unpublished)).

In *United States v. Rodríguez-González*, **Crim No. 13-369 (DRD)**, the Court reasoned that:

> Defendant could not objectively hold a reasonable expectation of privacy in [the third-party's] residence, as his stay therein violated the terms and covenants of the apartment's lease agreement. The First Circuit's stance on this issue is uncontroverted, an individual cannot have a legitimate expectation of privacy in a place where he does not have permission to be present.

**Crim No. 13-369 (DRD), ECF No. 72** at 3. (citing *Battle*, 637 F.3d at 49 (defendant's expectation of privacy was unreasonable, as he did not have actual permission to be in the residence); *United*

*States v. McCarthy*, 77 F.3d 522, 535 (1st Cir. 1996) (defendant did not have legitimate expectation of privacy in items left at a trailer after he was told to vacate the trailer); *United States v. Lnu*, 544 F.3d 361, 366 (1st Cir. 2008) (defendant lacked reasonable expectation of privacy in storage locker that he neglected to pay rent on).

Despite the cases cited by the government in support, the Court finds that the government's argument that Torres did not have a legitimate expectation of privacy is unpersuasive. Torres's situation is distinguishable from the cases cited in support of the ruling in *Rodríguez-González*. In the case at bar, Caraballo admitted during her testimony that she was aware that the rental agreement prohibits guests from staying for extended periods, and that she had no authority to authorize Torres to live at the residence for an extended period of time. And, Caraballo did not inform the government that Torres was living with her on May 10, 2017. She also gave contradictory testimony as to how long Torres had lived at the residence, and did not clarify if he stayed there every night. She further testified that on the day Torres was arrested, she did not tell the arresting officers that Torres had lived with her for the past three months.

However, in the cases cited by the government, the individual claiming an expectation of privacy had been expressly denied authorization to stay in the searched premises, and, thus, the individual had explicit, first-hand knowledge that he was unauthorized to enter or stay in said premises. *See Battle*, 637 F.3d at 49 (defendant's expectation of privacy was unreasonable, as he did not have actual permission to be in the residence); *McCarthy*, 77 F.3d at 535 (defendant did not have legitimate expectation of privacy in items left at a trailer after he was told to vacate the

trailer); *Lnu*, 544 F.3d at 366 (defendant lacked reasonable expectation of privacy in storage locker that he neglected to pay rent for).

In this case, the government has not established that Torres knew or should have known that Caraballo lacked authority to allow him to stay in her residence. Moreover, Caraballo testified that she had authorized Torres to stay with her; that she had authorized him to stay there from May 9, 2017 to May 10, 2017; that he slept on the sofa; that he did not have keys but that she left the front door open; and that he kept some of his clothes in her bedroom, where Torres was arrested and the gun was seized. Despite serious questions about her credibility as a witness, under the circumstances, the Court will credit Caraballo's assertion that she authorized Torres to stay as an overnight guest on the night of May 9, 2017.[7] Torres thus had a legitimate expectation of privacy in the J-2 residence at the time of his arrest.

Although the Court finds that Torres had a subjective and objectively reasonable expectation of privacy in the J-2 residence, the Court will deny his motion to suppress on the merits.

---

[7] The Government questioned Caraballo about when Torres began living at her apartment. During her testimony, Caraballo said that Torres may have been living in her apartment since February, approximately three months before his arrest on May 10, 2017. Even if the Court were to assume that this was not a reasonable term for an unauthorized overnight guest, and, thus, that the Government of Puerto Rico needed to authorize Torres's stay, the Government did not submit into evidence the contract that Caraballo had signed, nor show the terms establishing the contract's limitations on unauthorized guests.

B. **The motion to suppress fails on the merits.**

Torres moves the Court to suppress the evidence seized from the J-2 residence and his person on several grounds. First, Torres argues that the PRPD conducted an illegal search of the J-2 home because it entered and searched the residence without a valid search warrant or probable cause that would justify a warrantless entry and search. **ECF No. 23** at 5-9. Second, Torres argues that the PRPD lacked probable cause to arrest him. **ECF No. 23** at 10. Finally, Torres argues that even if the PRPD legally entered the residence and had probable cause to arrest him, the PRPD illegally searched the residence after his arrest, eventually finding and seizing a firearm. **ECF No. 23** at 10.

1. **The PRPD's entry into the J-2 residence was justified.**

Torres's principal argument for suppression is that the arrest warrant for García is insufficient to support the warrantless entry and search of the J-2 residence. **ECF No. 23** at 6.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016) (quotations omitted). Yet, "[a]n arrest warrant authorizes the police to enter a suspect's residence 'when there is reason to believe the suspect is within.'" *United States v. Hamilton*, 819 F.3d 503, 506 (1st Cir. 2016) (quoting *Payton v. New York*, 445 U.S. 573, 603 (1980)). "Even if it becomes known after entry that the residence is not the suspect's, the entry is justified if the police had 'reasonably believed' that (1) the suspect resided at the location and (2) the suspect would be present." *Hamilton*, 819 F.3d at 506 (citing *United States v. Graham*, 553 F.3d 6,

12 (1st Cir. 2009)); *see also United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011). "Conversely, absent exigency or consent, an officer may not search a third-party's residence on the basis of an arrest warrant without having a search warrant for the premises." *Solis–Alarcón v. United States*, 662 F.3d 577, 580 (1st Cir. 2011); *see Young*, 835 F.3d at 19–20 (1st Cir. 2016).

"Nevertheless, a warrantless entry into a person's dwelling may be permitted" to effect an arrest, so long as two conditions are met: one, the police had probable cause to enter the home, and two, "exigent circumstances" existed. *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005). Probable cause "exists when the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Ramírez-Rivera*, 800 F.3d 1, 27 (1st Cir. 2015) (quoting *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013) (internal quotation marks omitted)).

Here, the PRPD officers had a reasonable belief that García was in the J-2 residence on the morning of May 10, 2017. The day before Torres was arrested, Sgt. Andujar had received confidential information that García was staying at the J-2 residence, and he immediately corroborated the information. When he visited the house in the afternoon of May 9, 2017—less than 24 hours before entering the residence on May 10, 2017—he observed García looking out from the J-2 residence. If it was reasonable for officers to believe that García was staying at that residence, "it was reasonable for police to believe that he would be home at [6:00 a.m.]" *Hamilton*, 819 F.3d at 508 (quoting *Solis–Alarcón*, 662 F.3d at 580–81 ("[I]f [the suspect] did live there, it would be reasonable to believe him in residence early in the morning.")). And "no Fourth

Amendment violation occurs if officers enter a third party's home under the reasonable belief that the target named in the arrest warrant resides at the dwelling in question and will be present at the time of the entry." *Solis-Alarcón*, 662 F.3d at 580 (entry into residence of third party without consent did not constitute violation of Fourth Amendment) (citing *Werra,* 638 F.3d at 336–37 (1st Cir. 2011)); *see Graham,* 553 F.3d at 12–13.

Exigent circumstances also justified the PRPD Agent's entry into the residence without a search warrant. "Exigent circumstances exist where 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" *Fletcher v. Town of Clinton,* 196 F.3d 41, 49 (1st Cir. 1999) (quoting *United States v. Almonte,* 952 F.2d 20, 22 (1st Cir. 1991)). "There are four recognized categories of exigent circumstance: (1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [the suspect]." *Fletcher*, 196 F.3d at 49 (citations omitted).

Here, García was initially seen wearing a hood over his head, even while inside the house. He was walking towards the front of the house while carrying a weapon in his hands. While no threatening action had been undertaken by the suspect, it is not clear whether the individual had detected or not the officers' presence. Nonetheless, García was known to be a dangerous individual, and the confidential informant warned them that García had a weapon; consistent with such information, the officers reasonably believed that they saw García in the residence

holding a weapon; the J-2 residence was adjacent to a known drug point; officers had previously exchanged fire with individuals in Finca Galateo; and when the officers made their presence known, Torres fled. "An officer's *reasonable* belief that the delay needed to obtain a warrant would pose 'a threat to police or the public safety' is sufficient to create exigent circumstances." *Fletcher*, 196 F.3d at 49 (quoting *United States v. Curzi*, 867 F.2d 36, 42 (1st Cir. 1989) (emphasis in original)). Thus, exigent circumstances justified the officer's entry without a search warrant. *See United States v. Weems*, 322 F.3d 18, 23 (1st Cir. 2003) (entry was justified by exigent circumstances and did not violate Fourth Amendment because subject "was known to be armed with a dangerous weapon and to have a history of assault; he was seen at the premises and was evidently trying to escape; he had the opportunity to destroy or hide drugs or the gun, both illegal in his hands").

### 2.      Agent Llanos had probable cause to arrest Torres.

Torres's second argument for suppression is that the PRPD lacked probable cause to arrest him. **ECF No. 23** at 10. However, Agent Llanos had ample probable cause to justify the arrest. Torres was holding a firearm when he fled down the hall once he saw the PRPD agents at the door. While chasing the suspect, Agent Llanos saw Torres toss the weapon in the clothes bin, before he stood in the middle of the room and raised his hands. During his arrest, Torres never stated that he had a valid weapons permit and proactively abandoned and tried to hide the firearm—in a room with third parties, including a minor—when he fled from the PRPD agents. When Agent Llanos asked Torres for his name, Torres refused to identify himself or

provide a name. Agent Llanos testified that Torres looked similar to García, whom they expected to possess a weapon and be in that residence. In fact, Agent Llanos did not know that the individual he was arresting was not García until after he completed the arrest and secured the area.

The fact that Torres did not identify himself and tried to conceal the weapon perpetuated the officer's reasonable belief that probable cause existed to arrest Torres. More so, when questioned, Caraballo denied knowing him or what he was doing inside her residence. The totality of the circumstances thus established probable cause for Agent Llanos to arrest Torres. "A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest." *United States v. González-Seda*, 224 F. Supp. 3d 128, 137 (D.P.R. 2016) (citing *United States v. Diallo*, 29 F.3d 23, 25 (1st Cir. 1994)). *See also United States v. Aviles-Vega*, 783 F.3d 69, 77 n. 3 (1st Cir. 2015) ("Puerto Rico law creates a presumption that the possession or act of carrying a firearm without the appropriate weapons license or permit to carry 'shall be deemed as prima facie evidence of the fact that said person possesse[d] [or carried] the weapon with the intention of committing a crime.'" (quoting P.R. Laws Ann. tit. 25, § 458j)).

### 3.    Agent Llanos validly seized the firearm after Torres's arrest.

Torres's last argument, that the officers illegally searched the residence after his arrest in order to find the weapon, **ECF No. 23** at 10, is unpersuasive. Agent Llanos testified that he saw Torres holding a weapon, run to the end of the hallway, and toss the weapon in a clothes bin.

He further testified that he saw the weapon lying on top of the clothes bin, photographed it, and seize it. Although a valid arrest does not justify the search of defendant's entire house:

> the search-incident-to-arrest exception permits an arresting officer "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction" and to search "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." The justifications underlying the exception, as articulated in *Chimel,* were protecting officer safety and ensuring the preservation of evidence.

*United States v. Wurie*, 728 F.3d 1, 3–4 (1st Cir. 2013), (quoting *Chimel v. California,* 395 U.S. 752, 763 (1969)).

Here, Agent Llanos was justified in reaching into or searching the clothes bin for the discarded weapon, as it was in close proximity of Torres and within his reach at the moment of his arrest. The safety of the PRPD agents, Torres, and the occupants of the J-2 residence justified searching for and seizing the weapon.

## IV.    Conclusion

In light of the above, Daniel Torres-Viruet's motion to suppress, **ECF No. 23**, is hereby **DENIED.**  The Supplemental Motion at **ECF No. 29** is **NOTED.**

**SO ORDERED**.

At San Juan, Puerto Rico, on this 5th day of September, 2018.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**